# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KDME, INC., d/b/a/ SEAFORTH BOAT RENTALS, <br><br> Petitioner, <br><br> vs. <br><br> JANINE BUCCI and SAMANTHA BUCCI, <br><br> Claimants. | CASE NO. 05CV199  IEG (AJB) <br><br> **MEMORANDUM DECISION AND ORDER** |

The above-entitled matter came before the Court for trial without a jury on June 14 and 28, and July 10, 11, and 12, 2007.  Daniel E. Kenney, Esq. of Harrington, Foxx, Dubrow, and Canter appeared on behalf of KDME, Inc. d/b/a Seaforth Boat Rentals ("Seaforth" or "petitioner").  Kevin F. Quinn, Esq. and Alyson B. Taub, Esq. of Thorsnes, Bartolotta, and McGuire appeared on behalf of Janine and Samantha Bucci ("claimants").

This memorandum decision constitutes the Court's findings of fact and conclusions of law.

On February 2, 2005, petitioner filed a complaint for exoneration or limitation of liability. On May 31, 2005, claimants filed a claim.  On August 15, 2005, by leave of court, claimants filed a first amended claim alleging that petitioner acted with gross negligence.

This Court has admiralty jurisdiction pursuant to 46 U.S.C. § 181 et seq., 28 U.S.C. § 1333, and Federal Rule of Civil Procedure F.  The Court also has diversity jurisdiction pursuant to 28 U.S.C. § 1332. Venue is proper pursuant to 46 U.S.C. § 181 et seq. and Federal Rule of Civil

Procedure F(9) because the subject vessel is located in San Diego.

In the Pretrial Order, which the Court signed on June 7, 2007, the parties admitted to certain facts requiring no proof at trial as set forth in Section III of the Pretrial Order. The Court incorporates by reference the facts admitted by the parties that are set forth in the Pretrial Order. The Court's findings of fact are based upon those facts that are admitted in the Pretrial Order and the testimony presented at trial.

On August 25, 2004, claimants, accompanied by Alexandra Bucci and Kimberly Doros, visited Seaforth's Mission Bay location to rent a boat. At the rental counter, Janine Bucci conveyed her reluctance to rent because no one in the group had boating experience. Nicole Earls, who was working at the rental counter that day along with Lauren Sutton, responded to Janine Bucci, "If you can drive a car, you can drive a boat." Ms. Earls recommended a 16-foot Bayliner Capri boat with a 50-horsepower motor. Janine Bucci signed a contract to rent this boat for two hours. (Cls. Exhibit A.) After Janine Bucci signed the rental contract, Ms. Earls provided a map of Mission Bay, indicating where the group could operate the boat.

The group walked down to the dock, where they received further instructions from Ronnie Greathouse, Seaforth's dock manager. Janine Bucci reiterated her concern about renting as a first-time boater, and Mr. Greathouse responded that she could drive a boat because she could drive a car. Mr. Greathouse's job was to provide instruction in how to operate the rental boat safely. Mr. Greathouse focused on giving instructions to Janine Bucci because she was the sole signatory of the contract. After instructing Janine Bucci about boat operation, Mr. Greathouse informed the group that they could also rent, inter alia, an innertube. The group agreed to rent an innertube and, although none were immediately available, the group waited approximately ten minutes for one to arrive from another boat. At Janine Bucci's request, Mr. Greathouse attached the innertube to the boat by clipping two ends of the towline to metal rings on opposite sides of the outboard motor. Mr. Greathouse then pulled the towline and innertube into the boat. He provided Janine Bucci with safety instructions concerning use of the innertube. The total amount of safety instruction lasted less than fifteen minutes.

In determining the substance of the safety instruction that Mr. Greathouse provided to

1  Janine Bucci, the Court finds Janine Bucci to be a more credible witness. Janine Bucci was
2  apprehensive about renting a boat for the first time and thus more likely to recall the details of the
3  instruction she received. By contrast, Mr. Greathouse handled a substantial number of rentals
4  during his employment with Seaforth[1] and is less likely to recall the details of his instructions to
5  any particular renter.

6  Janine Bucci testified that Mr. Greathouse instructed on, <u>inter alia</u>, the steering wheel,
7  throttle, life jackets, the proper speed of operation, and locations to avoid on Mission Bay. Mr.
8  Greathouse did not, however, instruct Janine Bucci to watch him as he attached the innertube to
9  the boat. When Janine Bucci inquired about the proper method for deploying the innertube, Mr.
10  Greathouse instructed her to "just throw it in when you're ready." Janine Bucci likewise testified
11  that she had no recollection of Mr. Greathouse ever referring to the lanyard, <u>i.e.</u>, a red string
12  hanging from the throttle that, when pulled, shuts off the boat's engine. Mr. Greathouse did not
13  instruct Janine Bucci to attach the lanyard to the boat operator such that, if the operator moved
14  away from the wheel, the boat would automatically shut off.

15  Janine Bucci testified the group then drove the boat into Mission Bay. After
16  approximately fifteen minutes of operation, the boat stalled. Janine Bucci called the Seaforth
17  office from her cell phone. Lauren Sutton testified that she answered the phone and
18  unsuccessfully attempted to troubleshoot the group to get the engine restarted. Ms. Sutton then
19  located Mr. Greathouse, who was on lunch break at the time Janine Bucci called. Mr. Greathouse
20  contacted Janine Bucci for further troubleshooting. During this discussion, the engine restarted.
21  Nonetheless, the group indicated they wanted to return to Seaforth's office to obtain a replacement
22  boat, which Mr. Greathouse promised to provide without charge.

23  On their way back to the Seaforth office, claimants decided to innertube. Ms. Doros then
24  assumed operation of the boat. Having received no instruction from Mr. Greathouse regarding the
25  proper deployment of the innertube, the group deployed the innertube incorrectly. Properly
26  deployed, the towline forms a "Y" configuration relative to the outboard motor. (<u>See</u> Cls. Exhibit

---

28  [1] Mr. Greathouse testified at trial that he worked for Seaforth for three years prior to the incident giving rise to this litigation.

F.) Here, the group misdeployed the towline such that all the towline emanated from the port (left) side of the outboard motor. The engine stalled again but was restarted. As the group restarted the boat, Alexandra Bucci adjusted the towline such that it emanated entirely from the starboard (right) side of the outside motor.

Because of the improper deployment, the towline became wedged between the outboard engine and the engine mounting bracket, causing the steering to lock. Therefore, when Ms. Doros moved the throttle into the forward position, the boat made a sharp u-turn to the left, striking the innertube and injuring claimants.

Pursuant to the Limitation of Liability Act ("LOLA"),[2] "[t]he liability of the owner of any vessel . . . for any act, matter, or thing . . . done, occasioned, or incurred, without the privity or knowledge of such owner or owners shall not . . . exceed the amount or value of the interest of such owner in such vessel, and her freight then pending." 46 U.S.C. App. § 183(a). In other words, LOLA "limits shipowner liability arising from . . . negligence . . . unless . . . the act of negligence was within the shipowner's 'privity or knowledge.'" In re BOWFIN M/V, 339 F.3d 1137, 1137 (9th Cir. 2003); In re Arntz, 380 F. Supp. 1156, 1158 (C.D. Cal. 2005). The limitation-of-liability inquiry proceeds in two steps. First, the claimant (i.e., the injured party) must prove liability for negligence by a preponderance of the evidence. Carr v. PMS Fishing Corp., 191 F.3d 1, 4 (1st Cir. 1999); In re Muer, 146 F.3d 410, 415-16 (6th Cir. 1998); In re Consolidation Coal Co., 123 F.3d 126, 132 (3d Cir. 1997). If claimant does not carry its burden on negligence, then the Court exonerates the petitioner from liability. In re Hechinger, 890 F.2d 202, 207 (9th Cir. 1989); N. Fishing & Trading Co., Inc. v. Grabowski, 477 F.2d 1267, 1272 (9th Cir. 1973).

A court exercising admiralty jurisdiction "'look[s] to the common law in considering maritime torts.'" Royal Ins. Co. of Am. v. Sw. Marine, 194 F.3d 1009, 1015 (9th Cir. 1999)

---

[2] In 2006, legislation was enacted to complete the codification of title 46 of the United States Code. Act of October 6, 2006, Pub. L. No. 109-304, 120 Stat. 1485. The legislation reorganized and restated the law then-located in the appendix to title 46. Id. § 2. The provisions on exoneration and limitation of liability were recodified at 46 U.S.C. § 30501 et seq. Here, the Court cites to the statutory provisions as they were cited in the parties' pretrial briefing and as codified in the title 46 appendix prior to the Act of October 6, 2006.

(quoting Su v. M/V S. ASTER, 978 F.2d 462, 472 (9th Cir. 1992)). In California, "[t]he elements of actionable negligence are [1] a duty to use due care and [2] a breach of that duty which [3] proximately causes the plaintiff's injuries." Wright v. City of Los Angeles, 219 Cal. App. 3d 318, 344 (Cal. Ct. App. 1990). Under California's doctrine of respondeat superior, an employer is liable for an employee's torts when the employee acts within the scope of employment by, e.g., performing an act "required or incident to [his] duties[.]" Randolph v. Budget Rent-A-Car, 97 F.3d 319, 327 (9th Cir. 1996) (citing Cal. Civ. Code § 2338).

California imposes a general duty on "'all persons . . . to use ordinary care to prevent others from being injured as the result of their conduct.'"[3] Jackson v. Ryder Truck Rental, Inc., 16 Cal. App. 4th 1830, 1837-38 (Cal. Ct. App. 1993) (quoting Weirum v. RKO Gen., Inc., 15 Cal. 3d 40, 46 (Cal. 1975)). In determining the existence and scope of a duty in a particular case, the Court applies a multi-factor test which considers the foreseeability of harm, the certainty of the plaintiff's injury, the level of connection between defendant's conduct and the injury, defendant's moral culpability, the public policy of preventing harm, the consequences to the defendant and the community if the court imposes a duty and finds liability, and insurance. Delgado v. Trax Bar & Grill, 36 Cal. 4th 224, 237 n.15 (Cal. 2005); Ann M. v. Pac. Plaza Shopping Ctr., 6 Cal. 4th 666, 675 n.5 (Cal. 1993); Rowland v. Christian, 69 Cal. 2d 108, 113 (Cal. 1968).

Here, the language of the rental agreement requires claimants to make a higher showing of breach than ordinary negligence. Janine Bucci signed an agreement holding Seaforth harmless for "injury to persons or property or resulting in death. . . whether caused by the negligence of [Seaforth] or otherwise." (Exhibit A.) Although the exculpatory clause is enforceable with respect to Seaforth's negligence, "a party to a maritime contract should not be permitted to shield itself contractually from liability for gross negligence." Royal Ins. Co., 194 F.3d at 1016; accord Broadley v. Mashpee Neck Marina, Inc., 471 F.3d 272, 274-75 (1st Cir. 2006). Therefore, claimants must establish Seaforth's gross negligence. "California law defines 'gross negligence' as 'the want of even scant care or an extreme departure from the ordinary standard of conduct.'"

---

[3] California also imposes affirmative duties on those who occupy a particular relationship to others. However, claimants direct the Court to no special relationship that would impose an affirmative duty on Seaforth (as lessor) to claimants (as lessee and member of lessee's group).

1  Royal Ins. Co., 194 F.3d at 1015 (quoting Kearl v. Bd. of Med. Quality Assurance, 189 Cal. App.
2  3d 1040, 1052 (Cal. Ct. App. 1986)).  Within the Ninth Circuit, gross negligence is a case-by-case
3  determination.  Id. (quoting Todd Shipyards Corp. v. Turbine Serv., Inc., 674 F.2d 401, 411 (5th
4  Cir. 1982); Kahumoku v. Titan Maritime, LLC, 486 F. Supp. 2d 1144, 1153 (D. Haw. 2007).
5        To establish proximate causation, claimants must show that petitioner's breach is "a
6  substantial factor in bringing about" claimants' injury.  Mitchell v. Gonzales, 54 Cal. 3d 1041,
7  1054 (Cal. 1991); Mayes v. Bryan, 139 Cal. App. 4th 1075, 1093 (Cal. Ct. App. 2006).  Conduct is
8  a "substantial factor" if "'the effects of the actor's negligent conduct actively and continuously
9  operate to bring about harm to another.'"  Mayes, 139 Cal. App. 4th at 1093 (quoting Osborn v.
10 Irwin Mem. Blood Bank, 5 Cal. App. 4th 234, 253 (Cal. Ct. App. 1992)).
11       After the claimants establish negligence, the second step of the inquiry requires the
12 shipowner to prove its lack of privity or knowledge of the negligence by a preponderance of the
13 evidence.  Carr, 191 F.3d at 4; Muer, 146 F.3d at 416; Consolidation Coal Co., 123 F.3d at 132.  A
14 corporation has imputed knowledge of the negligent acts of its managing officers and supervisory
15 employees.  Waterman S.S. Corp. v. Gay Cottons, 414 F.2d 724, 731 (9th Cir. 1969); In re
16 Complaint of Morning Star Cruises, Inc., 2006 A.M.C. 2845, 2006 WL 2474070, at *6 (D. Haw.
17 Aug. 24, 2006).  A "managing officer" or "supervisory employee" is "any one to whom the
18 corporation has committed the general management or general superintendence of the whole or a
19 particular part of its business."  Gay Cottons, 414 F.2d at 731 (internal quotations omitted).  An
20 employee's title or rank is one factor, but "'the real test is . .. the largeness of [the employee's]
21 authority.'"  United States v. Standard Oil Co. of Cal., 495 F.2d 911, 917 (9th Cir. 1974) (quoting
22 Gay Cottons, 414 F.2d at 731).
23       Besides actual knowledge, LOLA's "knowledge" requirement also includes "'the means of
24 knowledge–of which the owner . . . is bound to avail himself–of contemplated loss or condition
25 likely to produce or contribute to loss[.]'"  Wash. State Dep't of Transp. v. Sea Coast Towing,
26 Inc., 148 Fed. Appx. 612, 614 (9th Cir. 2005) (quoting States S.S. Co. v. United States, 259 F.2d
27 458, 466 (9th Cir. 1957)); see Gay Cottons, 414 F.2d at 732 (vessel owner must show that it
28 employed "whatever means of knowledge are reasonably necessary" to prevent conditions giving

rise to losses); In re Sause Bros. Ocean Towing, 769 F. Supp. 1147, 1155 (D. Or. 1991) (owner's knowledge is measured not only by actual knowledge, but also by "what [it] is charged with finding out").

The Court finds, at the time Janine Bucci inquired about the deployment of the innertube, Mr. Greathouse owed the entire group a duty to explain and demonstrate proper deployment of the tube. Mr. Paul Larson, petitioner's expert on the standard of care, testified the standard of care requires a boat rental company to answer when a renter asks for specific information. The primary factor in determining the existence of a duty is the foreseeability of harm to the claimants. The Court's task in the foreseeability inquiry is "'to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced[.]'" Jackson, 16 Cal. App. 4th at 1839 (quoting Ballard v. Uribe, 41 Cal. 3d 564, 573 n.6 (Cal. 1986)). Where a boat renter inquires about the proper method of operating a particular piece of equipment, the failure to answer that inquiry accurately is likely to result in harm to anyone in the renter's party from the misuse of that equipment.[4] A nexus exists between Mr. Greathouse's failure to explain and demonstrate proper deployment of the tube and claimants' injuries because the group was ignorant of the way to deploy the tube properly. Such a duty imposes a minimal burden on petitioner, which is required merely to answer renters' questions correctly, and has overwhelmingly positive consequences for the community of boat renters, who can count on correct answers to all of their questions about the equipment they rent before traveling on the water. Where the prospective renter has sufficient concerns to ask about how to operate a piece of equipment, the Court finds the supposedly "intuitive" nature of the equipment's operation (in the opinion of those with years of boating experience) is no defense to negligence.

Mr. Greathouse's response to Janine Bucci's question about proper deployment of the innertube constituted an extreme departure from the ordinary standard of care. Rather than demonstrate proper deployment of the tube, or even explain the proper Y-configuration of the towline relative to the motor, Mr. Greathouse showed a lack of even scant care by telling Janine

---

[4] The foreseeability of harm to anyone in the renter's party makes it appropriate to impose a duty on petitioner as to the entire group, rather than only the renter.

1 Bucci to "just throw [the innertube] in when you're ready." Mr. Greathouse told the group about
2 the availability of innertubes; else, Janine Bucci would not have rented one. Furthermore, Mr.
3 Greathouse informed the group the towline could become stuck in the propeller. Nonetheless,
4 when Janine Bucci asked about the proper method of deployment, Mr. Greathouse provided a
5 generic, incomplete response and offered no demonstration to support that response. This was
6 gross negligence. Mr. Greathouse's gross negligence is attributable to petitioner under the
7 doctrine of respondeat superior because the act of assisting renters with their rental equipment was
8 "requisite or incident" to his duties as petitioner's dock manager. See Randolph, 97 F.3d at 327.

9 Mr. Greathouse's gross negligence was a substantial factor in bringing about claimants'
10 injury. Because Mr. Greathouse did not explain or demonstrate the correct way to deploy the
11 innertube, the group incorrectly deployed the innertube, both initially and as redeployed by
12 Alexandra Bucci. The improper deployment of the innertube resulted in the towline's becoming
13 wedged in the boat's motor, such that the steering mechanism locked. Once the steering
14 mechanism locked, the boat sharply u-turned and collided with the innertube. The effects of Mr.
15 Greathouse's grossly negligent response to Janine Bucci's question "actively and continuously
16 operate[d]" to cause claimants' injuries. See Mayes, 139 Cal. App. 4th at 1093. The Court finds
17 unpersuasive the testimony of petitioner's experts that they could not recall any similar accident
18 where a towboat struck the person or object being towed. For purposes of establishing proximate
19 cause, "what is required to be foreseeable is the general character of the event or harm . . . not its
20 precise nature or manner of occurrence." Bigbee v. Pac. Tel. & Tel. Co., 34 Cal. 3d 49, 57 (Cal.
21 1983); accord Constantinescu v. Conejo Valley Unified School Dist., 16 Cal. App. 4th 1466, 1474
22 (Cal. Ct. App. 1993). Here, a misdeployed towline was a foreseeable result of Mr. Greathouse's
23 grossly negligent response to Janine Bucci's question about how to deploy the towline properly.
24 This is true especially because Mr. Greathouse cautioned that the towline should stay away from
25 the propeller. Therefore, "the general character of the event" (i.e., a misdeployed towline) was
26 sufficiently foreseeable to establish proximate cause, regardless of whether the precise manner of
27 claimants' injuries was likewise foreseeable.

28 The Court also finds, where Janine Bucci informed Mr. Greathouse that she was a first-

time boat renter, Mr. Greathouse owed the entire group a duty to make some reference to the lanyard while instructing Janine Bucci in the safe operation of the boat. Dr. Alison Osinski, claimants' expert on the standard of care, and Mr. Larson both testified the standard of care required Mr. Greathouse to inform Janine Bucci that attaching the lanyard to the boat operator was mandatory. Mr. George Kurtz, as Seaforth's owner-operator and petitioner's second expert on the standard of care, testified the failure to recommend that the boat operator wear the lanyard would fall below the standard of care. The boat itself contains a warning next to the lanyard that failure to attach the lanyard to the boat operator "may cause injury or death." (Pet. Exhibit 30.) The existence of a duty is appropriate because the risk of harm is foreseeable, i.e., petitioner's failure to mention the lanyard is likely to result in harm from a collision where the operator was unable to stop the boat prior to the collision. If the boat rental company does not inform the renter about the function of the lanyard, the group will be foreseeably ignorant of the ability to stop the boat by having the operator step away from the steering wheel or otherwise pulling down on the lanyard. The foreseeable victims of a failure to mention the lanyard include not only the renter's group but also any person or vessel that actually collides with the boat.[5] Mr. Greathouse's failure to mention the lanyard is closely connected to claimants' injuries. Dr. John Clement, petitioner's accident reconstruction expert, testified that approximately ten seconds transpired between the time of the vessel's u-turn and its collision with claimants. Because Mr. Greathouse made no mention of the lanyard to Janine Bucci, she could not inform the rest of the group about the lanyard, either before or during that ten-second period. This duty imposes a minimal burden on petitioner, which already requires explanation of the lanyard as part of its "powerboat checklist". (See Cls. Exhibit AQ (referencing the "kill switch," a synonym for the lanyard).) The duty has positive consequences for the boat renting community because first-time boat renters become aware of an additional way to shut off the boat during an emergency.

Mr. Greathouse's failure to mention the lanyard to Janine Bucci constituted an extreme departure from the standard of care. Fully aware that Janine Bucci was a first-time boat renter,

---

[5] The foreseeability of harm to anyone who collides with the rented boat makes it appropriate to impose a duty on petitioner, at a minimum, as to the entire group, rather than the renter only.

1  Mr. Greathouse showed a lack of scant care by making no reference to a device that "may cause
2  injury or death" if not attached to the boat operator. As above, Mr. Greathouse's gross negligence
3  is attributable to petitioner under the doctrine of respondeat superior.

4  Mr. Greathouse's gross negligence was a substantial factor in bringing about claimants'
5  injury. Because Mr. Greathouse did not mention the lanyard, no one in the group knew the boat
6  could be shut off by pulling on the lanyard. Because the group did not know the lanyard's
7  function, claimants were injured without any attempt to avoid the collision by pulling the lanyard.
8  The group's failure to notice the warning printed next to the lanyard was not a superseding cause
9  that prevents petitioner from being liable for claimants' injuries. Dr. Richard Hornick, claimants'
10 human factors expert, testified that, even if Mr. Greathouse had told Janine Bucci the lanyard was
11 optional, such a description would create a "dismissive environment" that discouraged the girls
12 from paying attention to safety warnings inside the boat. Furthermore, the text of the warning
13 does not explain how to use the lanyard. Here, a foreseeable result of Mr. Greathouse's failure to
14 mention the lanyard to Janine Bucci is a collision in which the group did not pull the lanyard.
15 Therefore, "the general character of the event" (i.e., a collision) was sufficiently foreseeable to
16 establish proximate cause, regardless of whether this precise type of collision was likewise
17 foreseeable. See Mayes, 139 Cal. App. 4th at 1093.

18 The Court finds these acts of gross negligence were within petitioner's privity and
19 knowledge. Mr. Greathouse's gross negligence is imputed to petitioner. Mr. Greathouse testified
20 that, in August 2004, he was Seaforth's "dock manager" at the Mission Bay location, where his
21 responsibilities included "everything that went down on the water on the dock". Because
22 petitioner committed the "general management" of a "particular part of its business" to Mr.
23 Greathouse, he was a "managing officer," a/k/a "supervisory employee," at the time of the
24 incident. See Gay Cottons, 414 F.2d at 731. Furthermore, petitioner presented no evidence that it
25 employed the "means of knowledge reasonably necessary" to avoid the instructional errors that
26 contributed to claimants' injuries in this case. See id. at 732. In short, petitioner did not establish
27 by a preponderance of the evidence that Mr. Greathouse's gross negligence was beyond its privity
28 or knowledge. By failing to carry its burden on this second prong, petitioner is not entitled to have

its petition granted.

Having found that LOLA's provisions on limitation of liability do not apply to petitioner's gross negligence,[6] the Court must apportion fault among all potential tortfeasors. The Court finds that all members of the group are 0% at fault. Janine Bucci inquired about the proper deployment of the innertube, but received an incomplete and woefully inadequate answer. Furthermore, having identified herself as a first-time boat renter, Janine Bucci could not be expected to determine how to operate the lanyard on her own when Mr. Greathouse did not mention the lanyard. Therefore, Janine Bucci could not instruct the rest of the group on proper deployment of the innertube or use of the lanyard. Absent this information, Janine Bucci's decision to allow Ms. Doros to operate the boat was not a cause of claimants' injuries. The Court finds Janine Bucci is not at fault.

Alexandra Bucci is likewise not at fault because there was no way she could have known to deploy the towline in a "Y" configuration relative to the outboard motor. Alexandra Bucci followed Mr. Greathouse's instructions to throw the towline in the water when the group was ready to innertube. Kim Doros is also not at fault for failing to turn off the engine during the ten-

---

[6] Claimants' remaining allegations of gross negligence fail because each allegation does not satisfy one or more of the elements of gross negligence. The relevant standard of care did not require petitioner to provide Janine Bucci with a skipper and/or a boat with a skipole. Petitioner's rental counter employees did not depart extremely from the standard of care when they compared driving a car to driving a boat: many first-time renters capable of operating a car have successfully rented boats from petitioner. Furthermore, where dockhands instruct renters in safe operation of the boat and other rental equipment, the standard of care does not require rental counter employees to have actual boating experience. To the extent the boat was unseaworthy (because, e.g., the fuel gauge was inoperative or the anchor was not attached to the boat), this was not the legal cause of claimants' injuries. The standard of care did not require the posting of claimants' proposed warning concerning proper deployment of the innertube, as that warning did not satisfy the guidelines of the American National Standards Institute (ANSI). With the exception of the lanyard (discussed supra), Mr. Greathouse's failure to mention the items on the "powerboat checklist" was not the legal cause of this accident. The standard of care does not require petitioner to provide instructions for any particular length of time or to have a checklist in hand when instructing each renter. The failure to provide Janine Bucci with the document entitled "Innertube Safety Rules" was not the legal cause of the accident, as that document neither discussed proper deployment of the innertube nor referenced the lanyard. Petitioner did not depart severely from the standard of care in its response to Janine Bucci's distress call. Furthermore, Mr. Greathouse did not depart extremely from the standard of care by taking a lunch break, where he immediately returned Janine Bucci's phone call upon returning from that break. Finally, petitioner's handling of the distress call was not the legal cause of claimants' injuries, for the group did not deploy the innertube prior to making the distress call. For any other allegation of gross negligence not specifically discussed in this Order, the Court finds that such acts were not the legal cause of claimants' injuries.

second interval between the sharp u-turn and the collision with the innertube. Dr. Hornick testified the sudden turning of the boat was a "complex stimulus," i.e., an event without an obvious explanation. For a novice operator such as Ms. Doros, the complex stimulus would cause her to "freeze" and focus her cognitive faculties entirely on trying to control the boat. Therefore, even though Ms. Doros immediately perceived the loss of control, her ability to react to the loss of that control was not instantaneous. The Court finds Dr. Hornick's testimony persuasive.

The Court further finds the product manufacturers of the equipment involved in the accident are 0% at fault. Although the Pretrial Order cited a case involving the allocation of fault in products liability cases (see Pretrial Order ¶ 93), neither side alleged a products liability cause of the action in the pleadings nor presented evidence at trial concerning products liability. Petitioner's gross negligence, rather than any defects in the underlying equipment, was the sole legal cause of claimants' injuries.

Since all other potential tortfeasors are without fault, the Court finds petitioner 100% at fault for claimants' injuries.

For the foregoing reasons, the Court finds claimants have established petitioner's gross negligence by a preponderance of the evidence. Petitioner has not established by a preponderance of the evidence that it was without privity or knowledge of the gross negligence. Petitioner is entirely at fault for claimants' injuries. **IT IS HEREBY ORDERED** that petitioner's petition for limitation of liability is **DENIED WITH PREJUDICE**. The parties **SHALL APPEAR** for a status conference on **Monday**, **September 17**, **2007** at **10:30 a.m.** to schedule the damages phase of this proceeding.

**IT IS SO ORDERED.**

**DATED: August 14, 2007**

_____
**IRMA E. GONZALEZ, Chief Judge**
**United States District Court**